UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE STATE OF TENNESSEE | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No.  3:21-CV-00084 |
| v. | ) | (Judges _____) |
| | ) | |
| ABDELRAHMAN MOHAMED, | ) | |
| | ) | JURY TRIAL DEMANDED |
| and | ) | |
| | ) | |
| CECILIA MANACSA | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT OF THE UNITED STATES AND STATE OF TENNESSEE

Plaintiffs, the United States of America, by and through Francis M. Hamilton III, Acting United States Attorney for the Eastern District of Tennessee, and the State of Tennessee, by and through Herbert H. Slatery III, Attorney General and Reporter, bring this civil complaint against Abdelrahman Mohamed, M.D. ("Mohamed"), and Cecilia Manacsa ("Manacsa") (collectively, "Defendants") for damages and penalties under the False Claims Act, codified as amended at 31 U.S.C. §§ 3729–3733 and the Tennessee Medicaid False Claims Act ("TMFCA"), Tenn. Code Ann. §§ 71-5-181 to -185.

## NATURE OF ACTION

1.      Mohamed was a physician licensed to practice medicine in Tennessee and was the owner-operator of Hamblen Neuroscience Center, P.C. ("HNC").  Manacsa, who is Mohamed's

wife, supervised some of the employees at HNC, and in particular, the employee who was responsible for submitting claims to various payors for Mohamed's medical services.

2.      Unless otherwise stated, the applicable time-frame for this Complaint is January 2, 2012 through January 24, 2018.[1]

3.      This action arises from Defendants' scheme to defraud Medicare and TennCare, the Tennessee Medicaid program, by (a) submitting, or causing the submission of, false or fraudulent claims for payment for physician services that were not actually rendered, (b) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim for payment for physician services that were not actually rendered, and (c) causing pharmacies to submit claims for payment for false or fraudulent opioid controlled substance prescriptions that were issued outside the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

4.      In May 2017, Defendants each pleaded guilty to one count of conspiracy to commit healthcare fraud and ten counts of healthcare fraud, and Defendants each admitted that, between January 2, 2012 and September 26, 2016, Defendants directed employees to submit at least 7,063 fraudulent claims for office visits to Medicare and at least 4,329 fraudulent claims for office visits to TennCare.

5.      The claims for these office visits claimed that Mohamed was owed at least $953,505 from Medicare and $584,356 from TennCare for work that he did not perform.

6.      As a result of the fraudulent claims for these office visits, the Medicare and TennCare programs paid Mohamed at least approximately $497,950 and $235,492, respectively.

---

[1] Mohamed entered into an Agreed Order with the Tennessee Board of Medical Examiners and surrendered his medical license by Agreed Order dated January 24, 2018.

Mohamed also issued, and Manacsa caused to be issued, thousands of prescriptions for opioid controlled substance prescriptions that were issued outside the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

7.      As a result, Defendants caused pharmacies to submit claims for payment for thousands of fraudulent prescriptions to Medicare and TennCare.

8.      In each instance described in their respective plea agreements, as well as on many other occasions, Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, or knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in order to receive Government payment for the work not performed and related improper prescriptions.  *See* 31 U.S.C. §§ 3729(a)–(b).

9.      On March 21, 2018, the United States District Court for the Eastern District of Tennessee entered judgment against Defendants related to their respective plea agreements and ordered Defendants to pay, jointly and severally, a total of $733,442 in restitution; Defendants paid this in full at the time of sentencing.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(b).

11.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants are located in and transact business in this district.  Moreover, the acts proscribed by 31 U.S.C. § 3729, which are described herein, occurred in this district.

3

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this claim occurred in this district and Defendants are located in and transact business in this district.

13.     The United States and the State of Tennessee commence this action timely and in accordance with any applicable statutes of limitation. *See* 31 U.S.C. § 3731(b)(2); Tenn. Code Ann. § 71-5-184(b)(2).

## PARTIES

14.     Plaintiff, the United States of America, files this Complaint on behalf of the United States Department of Health and Human Services ("HHS") and its component, the Centers for Medicare & Medicaid Services ("CMS"). Plaintiff, the State of Tennessee, jointly files this Complaint on behalf of the Division of Health Care Finance, and its component, the Bureau of TennCare ("TennCare").

15.     Defendant Abdelrahman Mohamed is a physician formerly licensed in the State of Tennessee, his license having been revoked as a result of the facts that are the subject of this Complaint.

16.     Defendant Cecilia Manacsa, who is Mohamed's wife, assisted Mohamed in running his medical practice based in Morristown, Tennessee.

## OVERVIEW OF MEDICARE AND TENNCARE

17.     Medicare is a federally funded health insurance program that provides funds for healthcare services to persons aged sixty-five years and older, and certain disabled persons and persons suffering end stage renal disease who are under aged sixty-five. *See* 42 U.S.C. § 1395 *et seq.*

4

18.     The United States, through HHS, administers the Medicare Program.  HHS has delegated the administration of the Medicare Program to its component agency, CMS.  The United States pays Medicare claims from the Medicare Trust Funds through CMS.

19.     The different parts of Medicare provide coverage for specific services.  Medicare Part B covers, generally, physicians' services, outpatient care, durable medical equipment, preventative services, and certain physician-administered drugs.  Medicare Part D provides prescription drug coverage.

20.     The Medicaid Program, enacted under title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396 et seq., provides funding for medical and health related services for certain individuals and families with low incomes.  Those eligible for Medicaid include pregnant women, children, and persons who are blind or suffer from other disabilities and who cannot afford the cost of healthcare. 42 U.S.C. § 1396d.  The Medicaid program is a joint federal–state program. 42 U.S.C. § 1396b.  If a state elects to participate in the program, the costs of Medicaid are shared between the state and the federal government. 42 U.S.C. § 1396a(a)(2).  In order to receive federal funding, a participating state must comply with requirements imposed by the Social Security Act and regulations promulgated thereunder.

21.     The State of Tennessee participates in the Medicaid program pursuant to Tenn. Code Ann. §§ 71-5-101 to -199.  The federal government, through the Centers for Medicare & Medicaid Services (CMS), provides approximately 65% of the funds used by TennCare to provide medical assistance to TennCare beneficiaries.

22.     In return for receipt of federal subsidies, the State of Tennessee is required to administer TennCare in conformity with a state plan that satisfies the requirements of the Social

Case 3:21-cv-00084-DCLC-DCP   Document 1   Filed 03/12/21   Page 5 of 28   PageID #: 5

Security Act and accompanying regulations. 42 U.S.C. §§ 1396–1396vj; Tenn. Code Ann. § 71-5-102.

23. In Tennessee, the Department of Finance & Administration (F&A) administers TennCare through the Bureau of TennCare. Tenn. Code Ann. § 71-5-104. TennCare operates as a special demonstration project authorized by the Secretary of the Department of Health and Human Services under the waiver authority conferred by 42 U.S.C. § 1315. F&A supervises TennCare's administration of medical assistance for eligible recipients. Tenn. Code Ann. §§ 71-5-105 to -107. F&A is authorized to promulgate rules and regulations to carry out the purposes of TennCare. Tenn. Code Ann. §§ 71-5-124 to -134.

24. The Bureau of TennCare contracts with private managed care contractors (MCCs)[2] through contracts known as Contractor Risk Agreements (CRAs), which must conform to the requirements of 42 U.S.C. § 1395mm, along with any related federal rules and regulations. Tenn. Code Ann. § 71-5-128. The MCCs contract directly with healthcare providers to provide services to eligible TennCare beneficiaries. Providers who have entered into such a contract with an MCC are known as Participating Providers. Tenn. Comp. R. & Regs. § 1200-13-13-.01(89).

25. TennCare distributes the combined state and federal Medicaid funding to the MCCs based on a capitation model. Under the capitation model, TennCare pays each MCC a set amount each year for each TennCare member enrolled with that MCC. The MCCs, in turn, use the capitated payments to pay Participating Providers for treatment of TennCare beneficiaries.

---

[2] MCCs are sometimes referred to as Managed Care Organizations (MCOs).

## Physician Reimbursement For Evaluation and Management Visits

26. A provider has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage for the Medicare services it provides. *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

27. Physician reimbursement from Medicare is a three-step process: (1) appropriate coding of the service provided by utilizing Healthcare Common Procedure Coding System (HCPCS) codes, which include current procedural terminology ("CPT") codes; (2) appropriate coding of the diagnosis using ICD codes (ICD-9 codes until September 30, 2015, and thereafter, ICD-10 codes); and (3) the CMS determination of the appropriate fee, based on the resource-based relative value scale. See 42 U.S.C. 1395w–4; 42 C.F.R. Part 414, Subpart B.

28. When submitting claims to Medicare, providers certify on the CMS 1500, *inter alia*, that (a) the services rendered are medically indicated and necessary for the health of the patient; (b) the information on the claim form is "true, accurate, and complete"; and (c) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws." CMS 1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

29. Similarly, when enrolling to submit claims electronically, providers certify that they will submit claims that are "accurate, complete, and truthful." https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS10164B.pdf (last visited February 26, 2021).

30.     Physician reimbursement from TennCare is a similar process: (1) appropriate coding of the service provided by utilizing current codes, including CPT and ICD codes; (2) the MCCs payment of the claims, based on the applicable contract rates; and (3) with these payments being made from the capitated payments each MCC receives form the Bureau of TennCare.

31.     CPT codes are part of a uniform coding system consisting of descriptive terms and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals. https://www.hhs.gov/guidance/document/cms-hcpcs-coding-questions.  Health care professionals use the CPT codes to identify services and procedures for which they bill health insurance payors including Medicare and TennCare.  *Id*.  CPT Codes are documented and maintained by the American Medical Association.  *Id*.

32.     According to the CPT manual and during the dates of service at issue in this Complaint (January 2, 2012 through January 24, 2018), CPT code 99214 is used "for the evaluation and management of an established patient."  Am. Med. Ass'n, Current Procedural Terminology (CPT) 2018 Prof'l 13 (2017).  The CPT manual provides that a doctor should only bill for CPT code 99214 if, in connection with the visit of an established patient, the doctor performed "at least 2 of these 3 key components: a detailed history; a detailed examination; a medical decision making of moderate complexity."  *Id*.  Moreover, the CPT manual provides that "usually, the presenting problems are of moderate to high severity. Typically, 25 minutes are spent face-to-face with the patient and/or family."  *Id*.

### Reimbursement For Prescriptions

33.     Medicare Part D coverage is not provided within the traditional Medicare program model, but, rather, it is based on a private market model.  Medicare contracts with

8

private entities known as Part D Plan "Sponsors" to administer prescription drug plans. A Part D Sponsor may be a prescription drug plan, a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan (MA-PD plan), a Program of All-inclusive Care for the Elderly (PACE) organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. § 423.4.

34.     Medicare beneficiaries who wish to receive Part D benefits must enroll in one of hundreds of Part D Plans offered by various Part D Plan Sponsors.

35.     In order to receive Part D funds from CMS, Part D Plan Sponsors, their authorized agents, employees, and contractors are required to comply with all applicable federal laws, regulations, as well as CMS instructions.

36.     By statute, all contracts between a Part D Plan Sponsor and HHS must include a provision whereby the Plan Sponsor agrees to comply with the applicable requirements and standards of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112.

37.     Medicare Part D Plan Sponsors must also certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(h)(1).

38.     CMS regulations require that all subcontracts between Part D Plan Sponsors and downstream entities contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv).

39.     A Part D Plan Sponsor is required by federal regulation to certify to the accuracy, completeness and truthfulness of all data related to payment. This provision, entitled "Certification of data that determine payment," provides in relevant part, as follows:

(1) General Rule. As a condition for receiving a monthly payment . . . the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, . . must request payment under the contract on a document that certifies (based on best knowledge, information and belief) the accuracy, completeness, and truthfulness of all data related to payment.
. . .
(3) [Part D Sponsor] Certification of Claims Data: The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, . . . must certify (based on best knowledge, information and belief) that the claims data it submits . . . are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement.

42 C.F.R. § 423.505(k)(1) & (3).

40.     Compliance with the requirement that Prescription Drug Event ("PDE") data submitted by the Plan Sponsor is "true, accurate, and complete," based on best knowledge, information and belief, is a condition of payment to the Plan Sponsor under the Medicare Part D Program. 42 C.F.R. § 423.505(k)(3).

41.     PDEs submitted to Medicare for controlled substances that are dispensed when not issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice do not contain accurate, complete and truthful information about all data related to payment.

42.     Medicare only covers drugs that are used for a medically accepted indication, which means a use that is approved under the Food, Drug, and Cosmetic Act, or a use which is supported by one or more citations included or approved for inclusion in one of the specified compendia. 42 U.S.C. §§ 1395w-102(e)(1) & (e)(4); 42 U.S.C. §§ 1396r-8(g)(1)(B)(i) & (k)(6); 42 C.F.R. § 423.100.

43.     Prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as for recreational use, are not for "medically accepted indications" and are therefore not covered Medicare Part D drugs. 42 U.S.C. § 1395w-102(e)(1).

44.     TennCare will likewise only pay for medical items, including prescriptions, that are within the scope of the TennCare program and that are medically necessary. Tenn. Code Ann. § 71-5-144(a).

45.     Medicare only covers drugs that are dispensed upon a valid prescription. 42 U.S.C. § 1395w-102(e); 42 C.F.R. § 423.100.  A "Part D sponsor may only provide benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription." 42 C.F.R. § 423.104(h). A valid prescription must comply "with all applicable State law requirements constituting a valid prescription."  42 C.F.R. § 423.100.

46.     Under Tennessee law, prescribing controlled substances for pain will only be considered to be for a legitimate medical purpose in certain narrow circumstances, including after a documented medical history, pursuant to a written treatment plan with stated objectives, and considering the risk of medication misuse or diversion.  TENN. COMP. R. & REGS. §§ 0880-02-.14, 1050-02-.15.

47.     Under Tennessee law, prescribing controlled substances in amounts or for durations that are not medically necessary is beyond the scope of professional practice. TENN. COMP. R. & REGS. §§ 0880-02-.14, 1050-02-.13.

48.     Prescriptions that are not medically necessary, are not for a legitimate medical purpose, or are written beyond the scope of professional practice are not valid prescriptions.

49.     Part D plans may exclude drugs from payment if the drugs are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve functioning of a malformed body part. 42 U.S.C. § 1395w-102(e)(3) (incorporating by reference 42 U.S.C. § 1395y(a)).

11

50.     On October 26, 2017, the Secretary of HHS declared that the opioid epidemic is a national public health emergency under federal law.

https://www.hhs.gov/sites/default/files/opioid%20PHE%20Declaration-no-sig.pdf.  That declaration has been renewed every 90 days through to the present.

51.     The government routinely denies payment for controlled substance medications, or seeks to recoup payments already made, when such prescriptions are not issued or dispensed for a legitimate medical purpose in the usual course of professional practice.

52.     Additionally, the United States Department of Justice ("DOJ") has litigated or settled numerous actions where it was alleged that medical providers and/or pharmacies submitted claims for controlled substance medications to Medicare that lacked a valid prescription, were not for a legitimate medical purpose and lacked a medically accepted indication, or that did not comply with State law.  See, *e.g.*,

https://www.justice.gov/opa/pr/tennessee-chiropractor-pays-more145-million-resolve-false-claims-act-allegations (detailing $1.45 million settlement resolving allegations of improper billing for painkillers, including opioids, and including a nurse practitioner's surrender of her DEA registration); *United States ex rel. Norris v. Florence*, Civ. Action No. 2:13-cv-00035 (M.D. Tenn.) (ongoing FCA litigation against a physician for causing the submission of false claims by pharmacies for controlled substances that were not for a legitimate medical purpose); https://www.justice.gov/opa/pr/long-term-care-pharmacy-pay-315-million-settle-lawsuit-alleging-violations-controlled (Pharmerica CSA and FCA settlement for improper dispensing of and billing Medicare for unlawfully dispensed prescriptions).

53.     Accordingly, a reasonable person would know that Medicare would not pay for Part D claims submitted to Medicare if it knew that the controlled substance prescriptions at

issue were issued outside the scope of ordinary medical practice, were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity, and/or were otherwise invalid.

54.     Similarly, a reasonable person would know that TennCare would not pay for claims submitted to TennCare if it knew that the controlled substance prescriptions at issue were issued outside the scope of ordinary medical practice, were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity, and/or were otherwise invalid

## ALLEGATIONS

55.     At all times relevant to this Complaint, Mohamed was the owner and operator of HNC, located at 1907 W. Morris Blvd., Morristown, Tennessee 37813.

56.     Mohamed was the only licensed medical doctor who worked at HNC.  He was enrolled as a supplier in Medicare, meaning he was permitted to submit claims for reimbursement to Medicare for medical services he rendered at HNC.  Likewise, he was enrolled in TennCare.

57.     Manacsa, Mohamed's wife, supervised some of the employees at HNC, and, in particular, the employee who was responsible for submitting claims to various payors for Mohamed's medical services.

### Fraud Scheme

58.     Defendants were aware of the need to submit claims in compliance with published CPT codes and to certify that the claims were accurate, complete and truthful.

59.     Defendants' employed K.B. at HNC.  K.B.'s job responsibilities included submitting claims for reimbursement to Medicare and TennCare for the various medical procedures and services that Mohamed provided to Medicare and TennCare beneficiaries.

13

60.    Manacsa was responsible for supervising K.B. directly, although Mohamed indirectly supervised K.B., as well. Defendants told K.B. which CPT code to bill in connection with each, and every, patient visit.  K.B. never independently selected which CPT code to bill.

61.    Defendants caused K.B. to submit at least approximately 10,836 claims to Medicare on which they instructed K.B. to use CPT code 99214, thereby representing that Mohamed had provided services sufficient to satisfy the requirements associated with that code.

62.    Defendants caused K.B. to submit at least approximately 6,590 claims to TennCare on which they instructed K.B. to use CPT code 99214, thereby representing that Mohamed had provided services sufficient to satisfy the requirements associated with that code.

63.    Defendants knew that a large percentage of these 99214 claims were fraudulent because Mohamed did not visit with such patients at all, or, if he did so, visited with them only briefly and, in either case, failed to fulfill the CPT manual's requirements to claim for CPT code 99214.

64.    Defendants acknowledged in their respective plea agreements that the precise number of fraudulent 99214 claims that they caused to be submitted cannot be precisely known. However, they agreed that all of the following calculations and information are correct:

a.    Defendants caused K.B. to submit at least approximately 7,063 fraudulent 99214 bills to Medicare, and that such bills claimed that Mohamed was owed at least approximately $953,505 for work that he did not perform.  As a result of their fraudulent conduct, Medicare paid Defendants at least approximately $497,950.

b.    Defendants caused K.B. to submit at least approximately 4,329 fraudulent 99214 bills to TennCare, and that such bills claimed that Mohamed was owed

at least approximately $584,356 for work that he did not perform. As a result of Defendants' fraudulent conduct, TennCare paid Mohamed at least approximately $235,492.

65.     Defendants only scheduled established 99214 pain-management patient appointments on Monday, Tuesday, or Wednesday. On Thursday, Mohamed worked at least six hours per day, but did so with other types of patients (not patients who were visiting for 99214 visits). On Friday, Mohamed saw no patients.

66.     Defendants also admitted that, on hundreds of occasions between January 2, 2012 and September 26, 2016, Defendants caused sixty or more established 99214 pain-management patients to be scheduled on Mondays, Tuesdays, and Wednesdays. Mohamed, who was physically present at work between the hours of 8:30–9:00AM and 5:00–6:00PM on such days, actually performed no more than six hours of medical work during those hours, and typically spent approximately 2–4 hours total on 99214 patients. As such, Defendants each knew that Mohamed could not possibly have visited with this quantity of established 99214 pain-management patients on Mondays, Tuesdays, and Wednesdays in accordance with the standards set forth in the CPT manual.

67.     On at least 146 business days between January 2, 2012 and July 28, 2015, Defendants caused claims to be submitted to Medicare and TennCare that would have required Defendant to work for at least 13 hours on each such day. On 39 of those business days, Defendants caused claims to be submitted to Medicare and TennCare that would have required Mohamed to work at least 16 hours on each such day. Mohamed did not work 13 or more hours on any of these days.

15

68.     To process the high volume of patients waiting in HNC's waiting area, Defendants devised a scheme that the staff called the "drive-through."  To implement the drive-through, Defendants instructed the staff to line up all waiting established pain-management patients in the hallway outside of Mohamed's office.  Defendants then instructed the staff to escort the first patient into Mohamed's office.  The patient would meet with Mohamed for approximately 1–2 minutes while the door remained open and the other patients waited right outside. A staff member then handed Mohamed a partially completed prescription for a pain-management medication, which Mohamed would sign and give to the patient.  The patient would then leave Mohamed's office and the next patient would be brought in.  This process was repeated until all waiting established pain-management patients had received a prescription from Mohamed in the drive-through.  Each such patient would then be scheduled for another appointment the following month.

69.     Defendants implemented the drive-through on hundreds of occasions.

70.     Defendants caused 99214 claims to be submitted to Medicare or TennCare for all drive-through Medicare and TennCare patients, notwithstanding that they both knew Mohamed had failed to satisfy the CPT manual's requirements for submitting a 99214 claim with respect to these patients.

71.     Defendants knew that Mohamed did not conduct appropriate medical examinations of patients prior to writing them a prescription for a controlled substance.

72.     Defendants knew that Mohamed had not visited with the drive-through patients for any meaningful amount of time.

73.     Defendants knew that Mohamed did not obtain a detailed history from, and/or conduct a detailed examination of, the drive-through patients.

16

74.     Manasca and patients commonly understood that Mohamed would not scrutinize whether a patient's pain required a controlled substance prescription.

75.     Defendants knew that Mohamed gave each drive-through patient a prescription for a controlled substance (including, without limitation, for Hydrocodone, Oxycodone, Fentanyl, Morphine, Opana, Oxycontin, and Oxymorphone).

76.     Mohamed issued, and Manacsa caused to be issued, thousands of prescriptions for opioid controlled substances to his patients, and frequently did so on a recurring monthly basis, often for years.  Defendants knew that, when Mohamed issued such prescriptions, he issued opioid controlled substance prescriptions that were outside the scope of ordinary medical practice and/or that were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

77.     Defendants caused the submission of thousands of false or fraudulent pharmacy claims to Medicare and TennCare related to the opioid controlled substance prescriptions that were issued outside the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

78.     Mohamed knew that he issued large numbers of opioid controlled substance prescriptions because the State of Tennessee Department of Health ("TNDoH") notified him in 2012 that he was "identified as having a high rate of prescribing controlled substances."  Then, in 2014 the TNDoH notified him that he was "in the top fifty (50) of opioid prescribers of controlled substances" for April 1, 2013 through March 2, 2014.  Finally, in 2015, the TNDoH notified Mohamed that he was "in the top fifty (50) prescribers or the top ten (10) prescribers in small counties for opioid substances in the 2014 calendar year."

79.     Due to the excessive number of 99214 claims that Defendants caused to be submitted, various health care benefit programs and insurers, including Medicare, TennCare, and Humana, among others, conducted audits of the HNC's billing practice.  As part of these audits, the health care benefit programs and insurers requested copies of patient records corresponding to 99214 patient visits that had previously occurred within spans ranging from the previous several months to the previous couple of years.

80.     Defendants electronically stored patient records in a software program called Practice Partner.   This software "stamps" Mohamed's "electronic signature," together with a date and time, each time a patient's record is edited in Practice Partner.

81.     The patient records that the health care benefit programs and insurers requested as part of the audit lacked sufficient detail to justify the 99214 claims that Defendants caused to be submitted.   Accordingly, Mohamed fraudulently edited these patient records to make them more fulsome after he received the audit requests from the various health care benefit programs and insurers well after the purported patient visits had occurred.  To conceal the fact that Mohamed fraudulently edited these patient records, he instructed one of his staff members, "S.C.," to turn off the time-stamp / electronic signature feature within Practice Partner.  A representative of the software manufacturer instructed S.C. how to do this, but also explained to her that there was no legitimate medical reason to do so.

82.     Thereafter, Mohamed instructed S.C. by text message to turn off the time-stamp / electronic signature as part of pending audits on June 26, 2015, July 9, 2015, September 25, 2015, July 9, 2016, August 4, 2016, August 5, 2016, August 8, 2016, August 18, 2016, and August 25, 2016.  Manacsa, acting at Mohamed's instruction, also instructed S.C. by text

18

message to turn off the time-stamp / electronic signature as part of a pending audit on December 15, 2016.

83.    In addition, due to the excessive number of 99214 claims that Defendants caused to be submitted, in early 2014 the TNDoH initiated an investigation into Mohamed's medical practice generally and his 99214 billing practice specifically. As part of this investigation, a TNDoH investigator spoke with several of Defendants' 99214 patients and inquired as to how long, if at all, Mohamed was visiting with such patients during their appointments. Mohamed learned that TNDoH was meeting with his patients and inquiring about the length of their visits. After learning this fact, Mohamed sent an email to various HNC staff instructing them to contact HNC's 99214 patients. In that email, dated July 21, 2014, Mohamed instructed the HNC staff to tell each 99214 patient that TNDoH may try to contact them and "ASK[] IF YOU SEE THE DR EACH TIME YOU GET THERE, DOES HE EXAMINE YOU, HOW MANY MINUTES HE SPENDS WITH YOU AND OTHER QUESTIONS (sic)". In that email, Mohamed also instructed the staff to tell the 99214 patients that "IF FOR EXAMPLE YOU SAID ["]I DONT SEE THE DR EACH TIME I AM THERE" THEY WILL IMMEDIATELY ADD YOUR NAME TO THEIR COURT LIST TO SUMMON YOU AS A WITNESS[.] WE ARE NOTIFYING ALL OUR PATIENTS BECAUSE WE FEEL THAT OUR PATIENTS HAVE GENUINE PAIN PROBLEMS AND THEIR PAIN MEDS ALLOW THEY (sic) TO LIVE AS MUCH OF A NORMAL LIFE AS POSSIBLE[,] THEY, ON THE OTHER HAND, BELIEVE YOU SHOULD GET INJECTIONS OR SPINAL DEVICES NOT PAIN MEDS." Mohamed sent this email for the purpose of influencing his 99214 patients not to cooperate with the TNDoH investigation by suggesting that such patients would lose their opioid prescriptions if they cooperated.

84.     On February 15, 2017, investigators with the Department of Health and Human Services, Office of the Inspector General and the Tennessee Bureau of Investigation interviewed Mohamed.  During that interview, Mohamed discussed the claims he submitted for CPT code 99214 between January 2, 2012 and September 26, 2016.  In particular, Mohamed stated adamantly and unequivocally that he always met with each 99214 patient for 25 minutes. Mohamed knew that this statement was false at the time that he made it.  In reality, he knew that he caused thousands of 99214 claims to be submitted to Medicare and TennCare even though he knew that he had not visited with such patients at all or for only 1-2 minutes.

85.     Defendants admitted in their respective guilty pleas that they caused a 99214 claim to be submitted to Medicare or TennCare for all drive-through Medicare and TennCare patients, notwithstanding that they both knew that Mohamed had failed to satisfy the CPT manual's requirements for submitting a 99214 claim with respect to these patients.

**Exemplar Patients**

86.     Defendants also admitted in their respective guilty pleas that, in particular, they each knowingly and intentionally caused fraudulent 99214 claims to be submitted to Medicare and TennCare for the following patients with regard to the indicated appointment dates even though Defendants knew that Mohamed had not visited with such patients for any meaningful amount of time and had not satisfied the requirements (at least two these three key components: a detailed history; a detailed examination; or medical decision making of moderate complexity) for a CPT code 99214 claim.

87.     On or about July 29, 2013, Defendants knowingly and intentionally caused a fraudulent 99214 claim to be submitted to TennCare with respect to patient J.D., for which TennCare paid them $55.97.  Mohamed issued, and Manacsa caused to be issued, a prescription

to J.D. for an opioid controlled substance on the visit corresponding to this fraudulent claim. Between July 29, 2013 and June 30, 2014, Mohamed issued, and Manacsa caused to be issued, at least 35 prescriptions for opioid controlled substances to J.D., all or substantially all of which were outside of the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

88.     On or about July 31, 2013, Defendants knowingly and intentionally caused a fraudulent 99214 claim to be submitted to TennCare with respect to patient S.M., for which TennCare paid them $55.97.  Mohamed issued, and Manacsa caused to be issued, a prescription to S.M. for an opioid controlled substance on the visit corresponding to this fraudulent claim. Between July 31, 2013 and July 30, 2014, Mohamed issued, and Manacsa caused to be issued, at least 24 prescriptions for opioid controlled substances to S.M., all or substantially all of which were outside of the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

89.     On or about August 19, 2013, Defendants knowingly and intentionally caused a fraudulent 99214 claim to be submitted to TennCare with respect to patient S.H., for which TennCare paid them $55.97.  Mohamed issued, and Manacsa caused to be issued, a prescription to S.H. for an opioid controlled substance on the visit corresponding to this fraudulent claim. Between August 19, 2013 and July 22, 2014, Mohamed issued, and Manacsa caused to be issued, at least 32 prescriptions for opioid controlled substances to S.H., all or substantially all of which were outside of the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

90.     On or about August 21, 2013, Defendants knowingly and intentionally caused a fraudulent 99214 claim to be submitted to Medicare with respect to patient E.P., for which

Medicare paid them $78.29. Mohamed issued, and Manacsa caused to be issued, a prescription to E.P. for an opioid controlled substance on the visit corresponding to this fraudulent claim. Between August 21, 2013 and July 28, 2014, Mohamed issued, and Manacsa caused to be issued, at least 28 prescriptions for opioid controlled substances to E.P., all or substantially all of which were outside of the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

91. On or about August 27, 2013, Defendants knowingly and intentionally caused a fraudulent 99214 claim to be submitted to Medicare with respect to patient D.H., for which Medicare paid them $78.29. Mohamed issued, and Manacsa caused to be issued, a prescription to D.H. for an opioid controlled substance on the visit corresponding to this fraudulent claim. Between August 27, 2013 and July 30, 2014, Mohamed issued, and Manacsa caused to be issued, at least 25 prescriptions for opioid controlled substances to D.H., all or substantially all of which were outside of the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

92. On or about August 27, 2013, Defendants knowingly and intentionally caused a fraudulent 99214 claim to be submitted to Medicare with respect to patient M.P., for which Medicare paid them $78.29. Mohamed issued, and Manacsa caused to be issued, a prescription to M.P. for an opioid controlled substance on the visit corresponding to this fraudulent claim. Between August 27, 2013 and July 15, 2014, Mohamed issued, and Manacsa caused to be issued, at least 29 prescriptions for opioid controlled substances to M.P., all or substantially all of which were outside of the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

93.     On or about August 29, 2013, Defendants knowingly and intentionally caused a fraudulent 99214 claim to be submitted to Medicare with respect to patient L.T., for which Medicare paid them $78.29.  Mohamed issued, and Manacsa caused to be issued, a prescription to L.T. for an opioid controlled substance on the visit corresponding to this fraudulent claim. Between August 29, 2013 and July 31, 2014, Mohamed issued, and Manacsa caused to be issued, at least 25 prescriptions for opioid controlled substances to L.T., all or substantially all of which were outside of the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

94.     On or about September 4, 2013, Defendants knowingly and intentionally caused a fraudulent 99214 claim to be submitted to TennCare with respect to patient J.B., for which TennCare paid them $55.97.  Mohamed issued, and Manacsa caused to be issued, a prescription to J.B. for an opioid controlled substance on the visit corresponding to this fraudulent claim. Between September 4, 2013 and July 17, 2014, Mohamed issued, and Manacsa caused to be issued, at least 21 prescriptions for opioid controlled substances to J.B., all or substantially all of which were outside of the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

95.     On or about September 4, 2013, Defendants knowingly and intentionally caused a fraudulent 99214 claim to be submitted to Medicare with respect to patient L.W., for which Medicare paid them $78.29.  Mohamed issued, and Manacsa caused to be issued, a prescription to L.W. for an opioid controlled substance on the visit corresponding to this fraudulent claim. Between September 4, 2013 and August 6, 2014, Mohamed issued, and Manacsa caused to be issued, at least 38 prescriptions for opioid controlled substances to L.W., all or substantially all

of which were outside of the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

96.     On or about September 9, 2013, Defendants knowingly and intentionally caused a fraudulent 99214 claim to be submitted to Medicare with respect to patient C.T., for which Medicare paid them $78.29.  Mohamed issued, and Manacsa caused to be issued, a prescription to C.T. for an opioid controlled substance on the visit corresponding to this fraudulent claim. Between September 9, 2013 and August 11, 2014, Mohamed issued, and Manacsa caused to be issued, at least 22 prescriptions for opioid controlled substances to C.T., all or substantially all of which were outside of the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

97.     The above examples are only a small fraction of the total amount of fraudulent 99214 claims that Defendants caused to be submitted to Medicare and TennCare and are only a small fraction of the total amount of prescriptions for opioid controlled substances that Mohamed issued, and that Manacsa caused to be issued, which were outside the scope of ordinary medical practice and/or were not for a medically accepted indication and therefore lacked a legitimate medical purpose and medical necessity.

## COUNT ONE

**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A)(Presenting or Causing the Presentment of False or Fraudulent Claims)**

98.     Paragraphs 1 through 97 are re-alleged and incorporated by reference as though fully set forth herein.

99.     By virtue of the acts described above, during the applicable time-period, Defendants knowingly presented, or caused to be presented, to an officer, employee or agent of

24

the United States and Tennessee, false or fraudulent claims to obtain payment or approval, with knowledge that the claims were false, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A).

100. The United States and State of Tennessee paid the false or fraudulent claims described above because of the acts of Defendants and, as a result, the United States and the State of Tennessee have sustained damages in an amount to be determined at trial.

## COUNT TWO

**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B)(Making or Causing to be Made False Records or Statements to Get False or Fraudulent Claims Paid or Approved)**

101. Paragraphs 1 through 100 are re-alleged and incorporated by reference as though fully set forth herein.

102. By virtue of the acts described above, during the applicable time period, Defendants knowingly made or used, or caused to be made or used, false records and statements to get false or fraudulent claims paid or approved by the United States and the State of Tennessee under the Medicare and TennCare programs, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B).

103. The United States and the State of Tennessee paid the false or fraudulent claims described above because of the acts of Defendants and, as a result, the United States and the State of Tennessee have sustained damages in an amount to be determined at trial.

25

## COUNT THREE

**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(C)(Conspiring**
**to Defraud the Government By Getting a False or Fraudulent Claim Paid)**

104.    Paragraphs 1 through 103 are re-alleged and incorporated by reference as though fully set forth herein.

105.    By virtue of the acts described above, during the applicable time period, Defendants conspired to defraud the United States and the State of Tennessee under the Medicare and TennCare programs in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C) and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(C).

106.    The United States and the State of Tennessee paid the false or fraudulent claims described above because of the acts of Defendants and, as a result, the United States and Tennessee sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States and the State of Tennessee pray for judgment against Defendants as follows:

A.    On Counts One, Two, and Three under the False Claims Act and the Tennessee Medicaid False Claims Act, for the amount of the United States' and the State of Tennessee's damages, to be trebled as permitted by law.

B.    In addition, the United States requests that civil penalties of between $5,500 – $22,363 for each individual false claim, as are permitted by law, be applied together with such further relief as may be just and proper.[3]

_____

[3] Any person who violates the False Claims Act is liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 – or not less than $10,781 and not more than $22,363 – depending on when the claims were assessed and submitted.  31 U.S.C. § 3729(a)(1). Although the FCA pursuant to 31 U.S.C. § 3729(a) sets the penalties from $5,000 to $10,000, the

C.    The State of Tennessee requests that civil penalties of between $5,000 - $25,000

for each individual false claim, as are permitted by law, be applied together with such

further relief as may be just and proper.


## DEMAND FOR JURY TRIAL

Plaintiffs United States and the State of Tennessee hereby demand a trial by jury.


Respectfully submitted,

FRANCIS M. HAMILTON III
ACTING UNITED STATES ATTORNEY

By:    _____

Jeremy S. Dykes, Maryland Bar Member
Robert C. McConkey, III (BPR #018118)
Assistant U.S. Attorneys
Office of United States Attorney
800 Market St., Suite 211
Knoxville, TN 37902
(865) 545-4167
Jeremy.Dykes@usdoj.gov
Robert.McConkey@usdoj.gov

---

statutory penalties are adjusted upward for inflation. For all violations occurring on or before
November 2, 2015, and for assessments made before August 1, 2016 for violations occurring
after November 2, 2015, the applicable penalty range is $5,500 to $11,000 for each violation. 31
U.S.C. § 3729(a)(1); Civil Monetary Penalties Inflation Adjustment, 64 Fed. Reg. 47,099, 47,104
(Aug. 30, 1999); 79 Fed. Reg. 17436 (Mar. 28, 2014); 81 Fed. Reg. 42500 (Jun. 30, 2016);
codified at 28 C.F.R. § 85.3. For civil penalties assessed after August 1, 2016, whose associated
violations occurred after November 2, 2015, the applicable penalty range is $10,781 to $22,363
per violation. 31 U.S.C. § 3729(a)(1); Civil Monetary Penalties Inflation Adjustment, 81 Fed.
Reg. 42491 (Jun. 30, 2016); codified at 28 C.F.R. § 85.5.

27

_Herbert H. Slatery III_

HERBERT H. SLATERY III (BPR #009077)
Attorney General and Reporter

W. ANTHONY HULLENDER (BPR #019436)
Deputy Attorney General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 532-2536
Tony.Hullender@ag.tn.gov

28